UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------X
ANDREA MACKRIS, and
REBECCA GOMEZ DIAMOND,

                Plaintiffs,

        v.                          17 Civ. 9483 (DAB)
                                      <u>MEMORANDUM & ORDER</u>
BILL O'REILLY, FOX NEWS NETWORK LLC,
TWENTY-FIRST CENTURY FOX, INC.,

                Defendants.

-------------------------------------------X
DEBORAH A. BATTS, United States District Judge.


      Plaintiff Andrea Mackris ("Mackris") and Plaintiff Rebecca Gomez Diamond ("Diamond") bring this action against Defendant Bill O'Reilly ("O'Reilly"), Defendant Fox News Network LLC ("Fox"), and Defendant Twenty-First Century Fox, Inc. ("Twenty-First Century") (Fox and Twenty-First Century are collectively, "Fox Defendants"). Mackris and Diamond allege a single count of defamation each against O'Reilly and the Fox Defendants in their Second Amended Complaint ("SAC").

      Before the Court is O'Reilly's and the Fox Defendants' Motions to Compel Arbitration and/or Dismiss the Complaint. For the foregoing reasons, O'Reilly's and the Fox Defendants' Motions to Compel Arbitration are GRANTED; O'Reilly's and the Fox Defendants' Motions to Dismiss are therefore DISMISSED without prejudice.

I.   <u>Background</u>

A. <u>The Second Amended Complaint</u>

Fox is a television news and entertainment company and a wholly owned subsidiary of its parent company, Twenty-First Century. (Second Am. Compl. ("SAC") ¶¶ 5, 6, ECF No. 83.) Rupert Murdoch ("Murdoch") was, and is, the Chairman of Fox News and acting CEO, as well as the Co-Executive Chairman of Twenty-First Century. (<u>Id.</u>) O'Reilly hosted his own cable program on Fox. (<u>See Id.</u> ¶ 12.) Mackris, Diamond, and O'Reilly were[1] former employees of Fox. (<u>See Id.</u> ¶¶ 19, 12.)

On April 1, 2017, the New York Times published an article (the "Article") titled "Bill O'Reilly Thrives at Fox News, Even as Harassment Settlements Add Up." (<u>Id.</u> ¶ 16.) The Article alleged that O'Reilly and Fox had settled several harassment claims against O'Reilly and that the settlement funds were received by several former employees of Fox. (<u>Id.</u>) The Article identified five women by name, including Plaintiffs, as the recipients of these purported settlement funds. (<u>Id.</u>) The Article alleged that Mackris filed a sexual harassment lawsuit against O'Reilly which she subsequently settled with O'Reilly. (<u>Id.</u> ¶ 17.) The Article also alleged that

---

[1] The SAC alleges that O'Reilly's employment contract has yet to expire and he remains contractually bound to Fox and Twenty-First Century. (SAC ¶ 11.) The SAC implies that Diamond is no longer employed by Fox. (<u>See Id.</u> ¶ 19.) The Confidential Settlement Agreement between Mackris, Fox, and O'Reilly terminated her employment with Fox, by her voluntary resignation. (Terry Decl. Ex. 5 ("Mackris Agreement"), ECF No. 99-5.)

Diamond brought her complaints against O'Reilly to Fox and thereafter left the network bound by a confidentiality agreement. (Id. ¶ 19.)

On April 19, 2017, O'Reilly was taken off the air by Fox. (Id. ¶ 19.) Thereafter, the SAC alleges that O'Reilly made a number of public statements from April 2017 to November 2017 addressing the settled claims. These include:

1. that he is "vulnerable to lawsuits from individuals who want [him] to pay them to avoid negative publicity." (Id. ¶ 21.)

2. that, "[i]t is tremendously disheartening that we [O'Reilly and Fox] part ways due to completely unfounded claims." (Id. ¶ 22(a).)

3. that he was a "victim" of a "smear campaign," "a brutal campaign of character assassination this is unprecedented in post-McCarthyist America." (Id. ¶ 22(a).)

4. that "[n]o one was mistreated on [his] watch." (Id. ¶ 36, 41.)

5. that "[o]nce you get a famous name, you're in the political arena, the combination is devastating. If they can get you, they're going to get you." (Id. ¶ 37.)

6. that he was a "victim." (Id. ¶¶ 37, 39, 55, 65.)

7. that "[t]hey don't care if it's true or not[;] allegations become facts." (Id. ¶ 39.)

8. that "[he] can go to sleep at night knowing very well that [he] never mistreated anyone on [his] watch in 42 years." (Id. ¶ 41.)

9. that the harassment claims were a "political and financial hit job," and "politically and financially motivated." (Id. ¶¶ 48, 50.)

10. that no complaint was filed against him with Human Resources or with any legal team (Id. ¶ 53.)

11. that he has "physical proof that this is bullshit. Bullshit. ... it's all crap." (Id. ¶ 55.)

12. that "[the harassment allegations are] crap, and you know it. It's politically and financially motivated, and we can prove it, with shocking information." (<u>Id.</u>)

13. that his "biggest mistake was settling." (<u>Id.</u> ¶ 56.)

14. that "[i]n [his] case, all the confidentiality stuff was - violated - every bit of it." (<u>Id.</u> ¶ 57.)

15. that "[he] thought people would uphold their oath and what they agreed to do. They haven't." (<u>Id.</u> ¶ 58.)

16. that he was conducting an investigation after which he would give the public "facts . . . no he said she said[,] facts[,] cold stone facts [,] shocking the defamation that can occur." (<u>Id.</u> ¶ 59.)

17. that the settlements surrounding his alleged harassment are a "bunch of garbage." (<u>Id.</u> ¶ 60.)

18. that "[t]he bottom line is that my enemies who want to silence me have made my life extremely difficult and have hurt me in the marketplace. Anybody who doesn't like me will believe all this stuff the smear merchants put out..." (<u>Id.</u> ¶ 60.)

19. that the "New York Times knows that [he] cannot specifically refute anything." (<u>Id.</u>)

20. that "[t]here are two things here when it comes to women being, um, mistreated, that's the best word, every American should want one thing - justice . . . The other thing is verifiable. I've been in the business 43 years. Never once was there a complaint filed against me with any HR in 12 different companies. Verifiable." (<u>Id.</u> ¶ 61.)

21. that he has "been upfront on this from the very beginning. In [his] situation, [he] took the slings and arrows and [he] told [his] attorneys [they will] abide by what [they] promised to do." (<u>Id.</u> ¶ 66.)


        The SAC also alleges that the Fox Defendants made four public statements addressing the settled claims.

        First, on April 1, 2017, Fox allegedly published the following statement through its parent, Twenty-First Century, addressing the settled claims reported in the Article:

4

> Notwithstanding the fact that no current or former Fox News employee ever took advantage of the 21st Century Fox hotline to raise a concern about Bill O'Reilly, even anonymously, we have looked into these matters over the last few months and discussed them with Mr. O'Reilly. While he denies the merits of these claims, Mr. O'Reilly has resolved those he regarded as his personal responsibility. Mr. O'Reilly is fully committed to supporting our efforts to improve the environment for all our employees at Fox News.

(Id. ¶ 25.)

Second, on April 19, 2017, Fox allegedly published an article titled "Fox News drops Bill O'Reilly in wake of harassment allegations." The SAC alleges that the article quoted a press release issued by O'Reilly, through his lawyer, which "accused his liberal opponents of a 'smear campaign'" and alleged that "O'Reilly 'has been subjected to a brutal campaign of character assassination that is unprecedented in post-McCarthyist America.'" (Id. ¶ 22(a).)

Third, on September 18, 2017, O'Reilly appeared on Sean Hannity's radio show. (Id. ¶ 39.) O'Reilly allegedly made several statements pertaining to the settled claims. (Id.) Fox's website allegedly links to Sean Hannity's website. (Id. ¶ 40.) The website in turn allegedly links to Sean Hannity's radio show. (Id.)

Fourth, on December 14, 2017, Murdoch allegedly stated in an interview that the harassment claims at Fox were "nonsense" and that there was "a problem" former Fox chief executive, Roger Ailes, who was subsequently terminated. (Id. ¶ 68.) He allegedly also

5

stated, "that was largely political because we are conservative."
(Id.) The SAC then alleges that "Roger Ailes was not the only
harasser at Fox News. Bill O'Reilly harassed, abused or mistreated
Plaintiff." (Id. ¶ 73.)

Mackris and Diamond commenced this action on December 4,
2017.[2] (ECF No. 1.) On October 3, 2018, Mackris and Diamond filed
the operative SAC, (ECF No. 83), against O'Reilly and the Fox
Defendants bringing a single count of defamation against each
Defendant. They allege that O'Reilly's and the Fox Defendants'
statements about the settled claims portrayed Mackris and Diamond
as "extortionate, politically-motivated liars." (SAC ¶ 70.)
Therefore, Mackris and Diamond were exposed to "public contempt,
ridicule, aversion, and/or disgrace." (Id. ¶ 71.)

On October 31, 2018, O'Reilly and the Fox Defendants moved to
compel arbitration and/or dismiss the SAC. (O'Reilly's Mem., ECF
No. 107; Fox Defs.' Mem., ECF No. 98.)

### B. Mackris' Confidential Settlement Agreement

Mackris and the Law Firm Benedict P. Morelli & Associates
P.C, entered into a Confidential Settlement Agreement with
O'Reilly and Fox on August 8, 2004 (hereinafter, "Mackris

---

[2] Plaintiff Mackris and Plaintiff Diamond brought this case along with Plaintiff
Rebecca Witlieb Bernstein. (See Compl., ECF No. 1.) Pursuant to this Court's
Order on September 25, 2018, (ECF No. 81), Plaintiff Mackris' and Plaintiff
Diamond's claims were severed from those of Plaintiff Bernstein. The two actions
proceed separately.

Agreement"). (Terry Decl. Ex. 5 ("Mackris Agreement"), ECF No. 99-5.) The Agreement settled her unspecified claims against O'Reilly and Fox." (<u>Id.</u> at 1.)

The Dispute Resolution Clause states in relevant part:

> Any action arising out of or relating to this Agreement must only be brought and prosecuted before an arbitration panel in New York selected by and in accordance with the rules of the American Arbitration Association to the extent modified herein. . . .

(<u>Id.</u> at 8 ¶ 9(a).)

The Non-Disparagement Clause states in relevant part:

> "No party will disparage, denigrate or defame any other party and/or persons related to the other parties, or any of their business products or services."

(<u>Id.</u> at 6 ¶ 9(d).)

Under the Mackris Agreement, Fox's "related parties" expressly includes Fox's "past or present corporate divisions, subsidiaries, parents and affiliates, their predecessors, successors or assigns, and all of their respective directors, officers, agents, attorneys, representatives and employees, whether as individuals or in their official capacity." (<u>Id.</u> at 1.)


### C. Diamond's Confidential Settlement and Mutual Release Agreement

Diamond entered into a Confidential Settlement Agreement with O'Reilly and Fox on August 11, 2011 (hereinafter, "Diamond Agreement"). (Terry Decl. Ex. 6 ("Diamond Agreement"), ECF No. 99-

6.) The Agreement settled her claims against O'Reilly and Fox related to "unlawful termination, pregnancy discrimination, hostile environment sexual harassment, quid pro quo sexual harassment, sex discrimination, and retaliation" (Id. at 1.) The Agreement's "Arbitration Clause" states in relevant part:

> [A]ny dispute concerning this Agreement or anything else related to the Claims shall be brought in the first instance to mediator Margaret Shaw at JAMS. In the event that the dispute is not resolved through mediation, the matter shall be resolved through arbitration at JAMS, which decision shall be final and binding and not appealable to any court.

(Id. at 6 ¶ 9.)

The Non-Disparagement Clause states in relevant part:

> Diamond agrees that neither she, nor anyone acting on her behalf will make any disparaging statements, whether written or oral, direct or indirect, about O'Reilly, Fox News or any of the Releasees.

> O'Reilly agrees that neither he nor anyone acting on his behalf, will make any disparaging statements, whether written or oral, direct or indirect about Diamond.

> Fox News will direct Kevin Magee[3] and Dianne Brandi [Fox's Executive Vice President of Legal and Business Affairs] as follows: neither of them, nor anyone acting on Mr. Magee's or Ms. Brandi's behalf, may make any disparaging statements, whether written or oral, direct or indirect, about Diamond.

(Id. at 5 ¶¶ 5.1-5.3.)

Under the Diamond Agreement, "the Releasees" include "O'Reilly, Fox News, Fox News' parent company, its affiliated companies, or any of their present or former employees, directors,

---

[3] Kevin Magee's role at Fox is not specified in the Diamond Agreement.

officers, attorneys, heirs, executors, representatives, insurers, agents, successors and assigns." (Id. at 2 ¶ 2.1.)

## II.  Legal Standards

### A. Motion to Compel Arbitration

"In deciding motions to compel, courts apply a standard similar to that applicable for a motion for summary judgment." Nicosia v. Amazon.com, Inc., 834 F.3d 220, 229 (2d Cir. 2016) (internal quotation marks and citation omitted). That standard "requires a court to consider all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits[] . . . [and] draw all reasonable inferences in favor of the non-moving party." Id. (internal quotation marks and citations omitted).

### B. Who Decides the Question of Arbitrability?

"The question of whether the parties have agreed to arbitrate, i.e., the 'question of arbitrability,' is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise." Nicosia, 834 F.3d at 229 (quoting Howsam v. Dean Witter Reynolds, Inc. 537 U.S. 79, 83 (2002) and citing Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003)) (emphasis in original). "This principle flow[s] inexorably from

9

the fact that arbitration is simply a matter of contract between the parties." Id. (internal quotation marks and citation omitted) (alteration in original). "The district court must stay proceedings once it is 'satisfied that the parties have agreed in writing to arbitrate an issue or issues underlying the district court proceeding.'" Id. (quoting WorldCrisa Corp. v. Armstrong, 129 F.3d 71, 74 (2d Cir. 1997)).

Moreover, it is settled law in this Circuit that when the parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, "the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator." Contec Corp. v. Remote Solution Co., 398 F.3d 205, 208 (2d Cir. 2005); see Lapina v. Men Women N.Y. Model Mgmt., 86 F. Supp. 3d 277, 279 (S.D.N.Y. 2016); Shaw Group, Inc. v. Triplefine Int'l Corp., 322 F.3d 115, 122(2d Cir. 2003); PaineWebber Inc. v. Bybyk, 81 F.3d 1193, 1202 (2d Cir. 1996); Emilio v. Sprint Spectrum L.P., 508 Fed. App'x. 3, 5 (2d Cir. 2013); but see Republic of Iraq v. BNP Paribas USA, 472 Fed. App'x. 11, 13 (2d Cir. 2012) (denying, for other reasons, that the question of arbitrability is delegated to the arbitrator despite the incorporation of rules that empower an arbitrator to decide issues of arbitrability).

C. <u>Who Can Arbitrate?</u>

The FAA "embodies a national policy favoring arbitration," however, it "does not require parties to arbitrate when they have not agreed to do so." <u>Nicosia</u>, 834 F.3d at 228-29 (quoting <u>AT&T Mobility LLC v. Concepcion</u>, 563 U.S. 333, 346 (2011) and <u>Schnabel v. Trilegiant Corp.</u>, 697 F.3d 110, 118 (2d Cir. 2012)) (internal alternations omitted). Thus, a non-signatory generally may not seek to compel a signatory to a contract to arbitrate. <u>Contec</u>, 398 F.3d at 209 ("[J]ust because a signatory has agreed to arbitrate issues of arbitrability with another party does not mean that it must arbitrate with any non-signatory."); <u>see e.g.</u>, <u>Republic of Iraq v. BNP Paribas USA</u>, 472 Fed. App'x. 11, 13 (2d Cir. 2012); <u>In re Paragon Offshore PLC</u>, No. 16-10386, 2018 Bankr. LEXIS 2322, *31-34 (Bankr. D.Del. Aug. 6, 2018).

However, this Circuit recognizes that a signatory to a contract with an arbitration clause is estopped from avoiding arbitration with a non-signatory when the non-signatory and signatory "have a sufficient relationship to each other and to the rights created under the agreement." <u>Contec</u>, 398 F.3d at 209-11. In practice, no court in this Circuit has denied this right as long as there is some demonstrable relationship between the non-

signatory and the contract.[4] Indeed, all cases, but one, in this Circuit that address the ability of a non-signatory to enforce an arbitrability clause allow the non-signatory to estop the signatory plaintiff from denying an obligation to arbitrate.[5]

BNP Paribas, where the arbitration clause itself specifically excluded a non-signatory from availing itself of the arbitration clause, is the only narrow, fact-dependent exception to this general rule.[6] 472 Fed. App'x. at 13. In this case, the arbitration clause in question stated in relevant part that "[a]ny dispute, controversy, or claim arising out of or relating to this Agreement shall be referred by either Party to arbitration . . . ; [t]he

---

[4] Some Courts in this District interpret relational sufficiency to be a deeply fact-specific inquiry. Lapina v. Men Women N.Y. Model Mgmt., 86 F. Supp. 3d 277, 284 (S.D.N.Y. 2015) ("the signatory's claims [must be] integrally related to the contract containing the arbitration clause." (internal quotation marks and citation omitted)); Birmingham Assocs. v. Abbott Labs., 547 F. Supp. 2d 295, 296 (S.D.N.Y. 2008) (Whether a plaintiff is estopped from denying arbitration is a "fact-specific" inquiry requiring "careful review of the relationship among the parties, the contract[] they signed and the issues that had arisen among them." (internal quotation marks and citation omitted)). A deeply fact-specific inquiry on whether the signatory's claims are "integrally related to the contract containing the arbitration clause" overlaps substantially with whether the issue should be arbitrated. See e.g., Lapina, 86 F. Supp. 3d at 284-84; Abbott Labs., 547 F. Supp. at 302-03. We decline to engage in a deeply fact-specific analysis that robs the arbitrator of the very issue left to him: whether this dispute must be arbitrated.

[5] E.g., Contec Corp., 398 F.3d at 209-11; Katsoris v. WME IMG, LLC, 237 F. Supp. 3d 92, 105-06 (S.D.N.Y. 2017); Gerena v. Neurological Surgery, P.C., No. 15-4634, 2016 U.S. Dist. LEXIS 76080, *14-19 (E.D.N.Y. June 9, 2016); Lapina, 86 F. Supp. 3d at 284-85; Abbott Labs., 547 F. Supp. 2d at 302-04; Washington v. William Morris Endeavor Entm't, LLC, 10 Civ. 9647, 2011 U.S. Dist. LEXIS 81346 *25-29 (S.D.N.Y. July 20, 2011).

[6] The Second Circuit issued a summary order and brief opinion in this case affirming the District Court's judgment and reasoning for denying the non-signatory the ability to invoke the arbitration clause. BNP Paribas, 472 Fed. App'x. at 13. This Order has no precedential effect.

**Parties** shall be bound by the arbitration award rendered in accordance with such arbitration as the final adjudication of any such dispute, controversy, or claim." <u>Id.</u> at \*12-13 (emphasis added). Finding that the arbitration clause expressly excluded non-signatories from availing themselves of the arbitration clause, the Court concluded that the non-signatory, third-party beneficiary could not estop the signatory plaintiff from denying an obligation to arbitrate. <u>Id.</u>

## III. <u>Discussion</u>

### A. <u>Mackris' and Diamond's Defamation Claims Against O'Reilly and Fox</u>

The threshold question, whether Mackris and Diamond agreed to arbitrate their instant defamation claims against O'Reilly and Fox, must be decided by an arbitrator.[7]

Here, both arbitration clauses in the Mackris and Diamond Agreements clearly vest the "question of arbitrability" in the arbitrator. The Dispute Resolution Clause in the Mackris Agreement incorporates the American Arbitration Association ("AAA") Rules. (<u>See</u> Mackris Agreement at 9 ¶ 9(a).) Incorporating the AAA Comprehensive Arbitration Rules is "clear and unmistakable evidence" that the parties delegated questions of arbitrability to

---

[7] **Tellingly, Plaintiffs Mackris and Diamond do not dispute their obligation to arbitrate. (<u>See</u> Pl.'s Mem, ECF No. 120.)**

the arbitrator. <u>Accord</u> <u>Contec</u>, 398 F.3d at 208. Indeed, the AAA
Rules provide that:

> The arbitrator shall have the power to rule on his or her own
> jurisdiction, <u>including any objections with respect to the
> existence, scope or validity of the arbitration agreement</u>.

AAA Rule R-7(a) (emphasis added). Here, Mackris alleges that
O'Reilly and Fox defamed her by publicly discussing the very claims
settled in the Mackris Agreement. Whether Mackris has agreed to
arbitrate <u>this</u> dispute is therefore an issue pertaining to the
"scope" of the agreement. Thus, there is no doubt that the Mackris
Agreement clearly and unmistakably delegates, in writing, the
threshold question of arbitrability to an arbitrator.

Similarly, The Arbitration Clause in the Diamond Agreement
incorporates the JAMS Comprehensive Arbitration Rules. (Diamond
Agreement at 6 ¶ 9.) Incorporating the JAMS Comprehensive
Arbitration Rules is "clear and unmistakable evidence" that the
parties delegated questions of arbitrability to the arbitrator.
<u>Accord</u> <u>Emilio v. Sprint Spectrum L.P.</u>, 508 Fed. App'x. 3, 5 (2d
Cir. 2013). In fact, the JAMS Comprehensive Arbitration Rules
provide that:

> Jurisdictional and arbitrability disputes, <u>including disputes
> over the formation, existence, validity, interpretation or
> scope of the agreement</u> under which Arbitration is sought, and
> who are proper Parties to the Arbitration, shall be submitted
> to and ruled on by the Arbitrator. The Arbitrator has the

authority to determine jurisdiction and arbitrability issues as a preliminary matter.

2014 JAMS Comprehensive Arb. R. & P. 11(b) (emphasis added). Here, Diamond also alleges that O'Reilly and Fox defamed her by publicly discussing the very claims settled by the Diamond Agreement. Whether she has agreed to arbitrate <u>this</u> dispute is therefore an issue pertaining to the "interpretation or scope" of the agreement. <u>Accord</u> <u>Contec</u> 398 F.3d at 208. Thus, there is no doubt that the Diamond Agreement also clearly and unmistakably delegates, in writing, the threshold question of arbitrability to an arbitrator.

### B. <u>Mackris' and Diamond's Defamation Claims Against Twenty-First Century</u>

Both the Mackris and Diamond Agreements clearly and unmistakably delegate the threshold question of arbitrability to an arbitrator. However, Twenty-First Century is not a party to either agreement. Therefore this Court must also determine whether Twenty-First Century can avail itself of the arbitration clauses in the Mackris and Diamond Agreements.[8] We conclude that it can.

First, neither arbitration clause in the Mackris or Diamond Agreements explicitly excludes non-signatories from availing themselves of the arbitration clause. In fact, the Mackris

---

[8] Plaintiffs Mackris and Diamond, again, do not deny their obligation to arbitrate the question of arbitrability with non-signatory, Twenty-First Century. (<u>See</u> Pl.'s Mem., ECF No. 120.)

Agreement's Dispute Resolution Clause broadly delegates "<u>any</u> <u>actions</u> arising out of or relating to this Agreement" to arbitration. (Mackris Agreement at 8 ¶ 9(a) (emphasis added).) Similarly, the Diamond Agreement's Dispute Resolution Clause broadly delegates to arbitration, "<u>any dispute</u> concerning this Agreement or anything else related to the Claims." (Diamond Agreement at 6 ¶ 9 (emphasis added).) Moreover, neither arbitration clause says that arbitration can be commenced only at the request of a Party to the Agreement nor does it bind only the Parties to the Agreement to the outcome of arbitration. Thus, both are distinguishable from the arbitration clause in <u>BNP Paribas</u>.

Twenty-First Century also has a demonstrable relationship to both the Mackris and Diamond Agreements.[9] Both the Mackris and Diamond Agreements arise from and are directly related to claims they brought against O'Reilly and Fox, which is a wholly-owned subsidiary of its parent company, Twenty-First Century. Mackris also explicitly agreed not to disparage, denigrate, or defame signatories, Fox and O'Reilly, as well as non-signatories, "related parties." Indeed, Twenty-First Century is an expressly

---

[9] This Court in a related matter concluded that O'Reilly had a "sufficient relationship to Fox and the rights created under [a substantially similar] agreement. <u>Dhue</u>, 18-cv-2547, ECF No. 25 at 10 (quoting <u>Contec</u>, 398 F.3d at 209). Indeed, if O'Reilly, a former employee with no ongoing employment relationship with Fox can estop a signatory from denying her obligation to arbitrate, then Fox's corporate parent and a party expressly released under both Agreements, Twenty-First Century, has more than a "sufficient relationship to Fox and the rights created under [a substantially similar] agreement" to do the same.

defined "related party" in the Mackris Agreement because it is Fox's "parent and affiliate." Similarly, Diamond agrees in the Non-Disparagement Clause not to disparage signatories, O'Reilly and Fox, as well as non-signatories, the "Releasees." Again, Twenty-First Century is an expressly defined "Releasee" in the Diamond Agreement because it is Fox's parent company.

This Court thus concludes that the broad terms of both arbitration clauses combined with Twenty-First Century's relationship to Fox and both Agreements estops Mackris and Diamond from denying an obligation to arbitrate the question of arbitrability with Twenty-First Century.

## C. <u>O'Reilly's and the Fox Defendants' Motions to Dismiss are DISMISSED</u>.

Because Mackris' and Diamond's claims are subject to mandatory arbitration, O'Reilly's and the Fox Defendants' Motions to Dismiss are DISMISSED without prejudice. <u>See</u> 9 U.S.C. § 3; <u>Lapina</u>, 86 F. Supp. 3d at 288 (citing <u>Murray v. UBS Sec., LLC</u>, No. 12 Civ. 5914, 2014 WL 285093, at *14 (S.D.N.Y. January 27, 2014); <u>Guida v. Home Sav. of Am., Inc.</u>, 793 F. Supp. 2d 611, 620 (E.D.N.Y. 2011); <u>Kowalewski v. Samandarov</u>, 509 F. Supp. 2d 477, 491 (S.D.N.Y. 2008)).

IV.   Conclusion

For the reasons set forth above, O'Reilly's and the Fox Defendants' Motions to Compel Arbitration are GRANTED; the threshold question, whether these disputes are subject to arbitration, is delegated to the arbitrator. O'Reilly's and the Fox Defendants' Motions to Dismiss are DISMISSED without prejudice.

SO ORDERED.

Dated: New York, New York
       March 6, 2019

                                    Deborah A. Batts
                           United States District Judge