UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

RACHEL WITLIEB BERNSTEIN,  :

               Plaintiff,  :

  :

v.  :

  :

BILL O'REILLY,  :

  :

            Defendant.  :

-------------------------------------------------------x

Civil Action No. 1:17-cv-9483(DAB)

**PLAINTIFF RACHEL WITLIEB
BERNSTEIN'S SECOND AMENDED
COMPLAINT AND JURY DEMAND**

Plaintiff, **RACHEL WITLIEB BERNSTEIN**, through her attorneys, Smith Mullin, P.C., alleges as follows:

### PRELIMINARY STATEMENT

1.    This is a civil action by the plaintiff, Rachel Witlieb Bernstein, ("Plaintiff" or "Ms. Bernstein,"), against defendant Bill O'Reilly ("Defendant" or "O'Reilly") for defamation and breach of contract.

### THE PARTIES

2.    Plaintiff, Rachel Witlieb Bernstein, is a resident and citizen of California.

3.    Defendant Bill O'Reilly is a citizen of New York State residing in Long Island.

### JURISDICTION

4.    This Court has diversity jurisdiction over this action pursuant to 28 *U.S.C.* § 1332 in that the plaintiff's citizenship is completely diverse from that of the defendant and the matter in controversy exceeds the sum of $75,000.00 exclusive of interest and costs.

1

## VENUE

5.     Venue is proper in this District under 28 *U.S.C.* § 1391(b)(2) because most of the conduct at issue took place in New York City, the contract at issue was entered in New York City, and the contract provides that New York law applies.

## COUNT ONE

## (DEFAMATION)

**A.     Defendant's Harassment and Abuse of Plaintiff**

6.     Plaintiff was hired by Fox News Channel in September 1996 as a Producer covering entertainment news.

7.     In September of 2001, plaintiff began to cover hard news.  Sometime thereafter, plaintiff was asked by Executive Producer, Bill Shine, to produce a Saturday evening show that would include the most popular segments of Bill O'Reilly's weekday shows.

8.     Immediately upon being assigned to work with defendant Bill O'Reilly on the Saturday evening "best of" show, O'Reilly began to treat plaintiff in a condescending, disparaging and hostile way.  Defendant O'Reilly frequently completely ignored plaintiff's e-mails and harassed and abused plaintiff because of her gender and religion.

9.     One of plaintiff's jobs was to speak into O'Reilly's earpiece from the control room to manage the filming.  Defendant O'Reilly refused to speak to plaintiff and said frequently in front of others:  "Who is this?  I'm not talking to her."  Defendant O'Reilly often insulted plaintiff in front of others and said directly to plaintiff:  "I don't have to talk to you."

2

10.     Defendant O'Reilly has repeatedly falsely claimed, in order to portray plaintiff in a false and defamatory light, that none of the women described in The New York Times article (and, in fact, no woman *ever*) complained about him to Human Resources or management at Fox News.  That is a false statement.  Plaintiff did complain about defendant O'Reilly's harassment of her.

11.     Plaintiff complained about defendant O'Reilly's abuse and mistreatment to Executive Producer, Bill Shine, and to Human Resources Director Jennifer Cugini.

12.     Plaintiff advised Bill Shine that defendant O'Reilly was publicly insulting and abusing her.  She told Shine that she went home every day filled with anxiety and dread.  As a result of defendant O'Reilly's harassment, plaintiff began seeing a therapist and taking anti-depressants and anti-anxiety medication.

13.     In response to plaintiff's complaints, Bill Shine told plaintiff that he would "talk to Bill" and that plaintiff should "just keep her head down and keep doing her job."

14.     Bill Shine took no action to protect plaintiff even after she told him that she was afraid of Bill O'Reilly and feared that O'Reilly's anger could lead to physical violence.

15.     Plaintiff met with HR Director Jennifer Cugini and told her the same things that plaintiff told Executive Producer Bill Shine.  Rather than take any action, Ms. Cugini asked if plaintiff wanted to file a "formal complaint."  Plaintiff said yes, and she did file a formal complaint.

16.     Neither Bill Shine nor Jennifer Cugini took any action to protect plaintiff from the abuse, mistreatment, insults and hostile environment created by defendant O'Reilly.  In

3

fact, things continued to get worse.  No investigation into O'Reilly's harassment was conducted.

17.     Defendant O'Reilly's public abuse of plaintiff became so bad that she asked a co-worker to please talk into O'Reilly's ear during taping so that plaintiff didn't have to deal with him directly.

18.     One day in the spring or summer of 2002, plaintiff was in the control room sitting next to a co-worker who was talking to defendant O'Reilly into his earpiece.  At some point, the Teleprompter failed and O'Reilly went berserk.  O'Reilly began screaming at plaintiff through the camera, blaming plaintiff for what was happening.  The camera was rolling so Fox News has evidence of his abusive, threatening behavior on this day (and others).

19.     O'Reilly was screaming that plaintiff was responsible for the Teleprompter going down and that plaintiff had "no business working" at Fox News.  In reality, plaintiff had absolutely nothing to do with the Teleprompter.

20.     Plaintiff became fearful, embarrassed and anxious and she left the control room and went back to her desk in the newsroom.  Plaintiff was sitting down in front of her computer crying when O'Reilly appeared at plaintiff's desk screaming at her.  Defendant O'Reilly is a very big man, much larger than plaintiff.  O'Reilly threatened plaintiff by poking his finger in her face and he brought his face within inches of plaintiff's face while screaming at her.  One of the things plaintiff remembers most clearly that O'Reilly was screaming was "we don't need your kind here."  The only interpretation of this statement that makes any sense is that O'Reilly meant that "plaintiff's kind" was a Jewish woman.

21.    Plaintiff was terrified that O'Reilly was going to physically assault her. Finally, an on-air personality walked over and told O'Reilly to back off.  That co-worker then called Bill Shine on plaintiff's behalf.

22.    Bill Shine sent two people down to walk plaintiff (not defendant O'Reilly) out of the building.

23.    Plaintiff was crying and shaking as she left the building.

24.    When plaintiff got home, there was a message on her answering machine from Bill Shine.  He stated that he had heard about "an issue with Bill in the newsroom" and that he was "sorry that happened."  Shine told plaintiff to "take a few days off."

**B.    The Severance Agreement and General Release**

25.    The following Monday, plaintiff met with Bill Shine.  It was clear to plaintiff that she had to leave Fox News.  Plaintiff hired a lawyer who helped her negotiate a Severance  Agreement because it was clear she would not be allowed to return to her job at Fox News.

26.    The July 2002 Severance Agreement and General Release provides at Paragraph 4 a. that plaintiff releases not only Fox News, but also its employees and Household Inc.  Upon information and belief, Household Inc. is a company under which Bill O'Reilly did business.  Thus, Bill O'Reilly is a Third Party beneficiary of the Release as an "employee" of Fox News and through Household Inc., a company with which he was affiliated, as a Releasee.

27.    Fox News also assigned some promises and duties to Defendant O'Reilly in Paragraph 5(f). In addition to being a Third Party Beneficiary to the Severance Agreement

and General Release between Plaintiff and Fox News, defendant O'Reilly is also an assignee

in the Non-disparagement clause which Provides:

> Non-Disparagement: Wittlieb (sic) and Fox each agree not to
> disparage, trade libel, or otherwise defame each other, and in
> the case of Fox, Wittlieb (sic) agrees not to disparage, trade
> libel, or otherwise defame its officers or employees, including
> without limitation, **Bill O'Reilly**. **In the case of Wittlieb (sic),**
> **for purposes of this Paragraph 5(e), the term "Fox" shall**
> **mean the released parties referenced in Paragraph 4(a)**
> **above, including Bill O'Reilly, and said released parties**
> **agree not to disparage, trade libel, or otherwise defame**
> **Wittlieb.** (sic) (emphasis supplied)

28.     Plaintiff Bernstein has in no way violated any of the provisions of the

Severance Agreement to which defendant O'Reilly is a Third Party Beneficiary and Assignee.

**C.      The New York Times Reporting**

29.     On April 1, 2017, <u>The New York Times</u> reported that "Bill O'Reilly Thrives

at Fox News, Even as Harassment Settlements Add Up."  The article by Emily Steel and

Michael S. Schmidt revealed that defendant O'Reilly and/or defendant Fox News had paid

five women about $13 million to forego litigation and never speak about what O'Reilly did to

them.  The article specifically mentioned plaintiff Bernstein by name:

> Fox News has been aware of complaints about inappropriate
> behavior by Mr. O'Reilly since at least 2002, when Mr.
> O'Reilly stormed into the news room and screamed at a young
> producer, according to current and former employees, some of
> whom witnessed the incident.

> Shortly thereafter, the woman, Rachel Witlieb Bernstein, left
> the network with a payout and bound by a confidentiality
> agreement, people familiar with the deal said.  The exact
> amount she was paid is not known, but it was far less than the
> other settlements.  The case did not involve sexual harassment.

6

30.     Ms. Bernstein was not the source of the information printed in The New York Times.

31.     Ms. Bernstein at all times relevant to this lawsuit was a member of a small identifiable group of five women named in the April 1, 2017 New York Times article. The statements made by defendant regarding the New York Times reporting are easily understood as of and concerning plaintiff and the other women named in the article.

**D.     Defendant's Disparaging and Defamatory Statements**

32.     In the April 1, 2017 New York Times article, Mr. O'Reilly violated the non-disparagement clause to which he was an assignee in Ms. Bernstein's severance agreement and defamed her by stating:

> Just like other prominent and controversial people, I'm
> vulnerable to lawsuits from individuals who want me to pay
> them to avoid negative publicity.  In my more than 20 years at
> Fox News Channel, no one has ever filed a complaint about me
> with the Human Resources Department, even on the
> anonymous hotline.
>
> * * *
>
> The worst part of my job is being a target for those who would
> harm me and my employer, the Fox News Channel. Those of us
> in the arena are constantly at risk, as are our families and children.
> My primary efforts will continue to be to put forth an honest TV
> program and to protect those close to me.

33.     Defendant continued his defamation of the plaintiff, publicly stating on April 19, 2017, to Howard Kurtz on Fox News that he was  "disheartened" that he was "parting ways with Fox News" due to **completely unfounded** claims" which are part of a "liberal smear campaign" and a  "**brutal campaign of character assassination that is**

7

**unprecedented in post-McCarthyist America**." This article is still available on line

http://ww.foxnews.com/entertainment

/2017/04/19/fox-news-drops-bill-oreilly-in-wake-harassment-allegations.html.

34.     Defendant O'Reilly continued his disparagement and defamation of Ms.

Bernstein on O'Reilly's website and in comments published by The Hollywood Reporter on

April 21, 2017 stating:

> But most importantly, I'm a father who cares deeply for my
> children and who would do anything to avoid hurting them in
> any way.  And so I have put to rest any controversies to spare
> my children.
>
> The worst part of my job is being a target for those who would
> harm me and my employer, the Fox News Channel.  Those of
> us in the arena are constantly at risk, as are our families and
> children.  My primary efforts will continue to be to put forth an
> honest TV program and to protect those close to me.

35.     On September 13, 2017, defendant Bill O'Reilly again falsely stated to The

Hollywood Reporter that "**no one was mistreated on my watch**." This statement falsely

portrayed the plaintiff and others (the small group identified in the April 1, 2017 New York

Times article) as liars.

36.     Also on September 13, 2017, defendant O'Reilly stated to The Hollywood

Reporter that "once you get a famous name, and once you're in the political arena, the

combination is devastating.  **If they can get you, they're going to get you.**" O'Reilly

presented himself as a victim of a vast conspiracy and not a serial abuser and coward hiding

behind the non-disclosure agreements he forced his victims to sign.

37.     On September 18, 2017, defendant O'Reilly was a guest of Fox Anchor Sean

Hannity on Hannity's radio show, "The Sean Hannity Show."   On that September 18, 2017

radio show, O'Reilly defamed Plaintiff by portraying himself as a "victim" of women who

falsely accused him of harassment and made claims against him, that he had conducted an

investigation into many of the women who had reported him and it produced "shocking

results" and that he was "the latest victim" of a progressive campaign aimed at getting him

off the air.   O'Reilly continued to claim:

- that after his "investigation" he would give the public "facts," "no he said she said. Facts.  Cold stone facts.  Shocking the defamation that can occur."

- Clearly referring to the harassment claims made against him in The New York Times article, O'Reilly said, "They don't care if it's true or not.  Allegations become facts."

- By making such false statements, O'Reilly was referring to Plaintiff, a member of the small group of women who were previously identified in the said New York Times articles, in yet another attempt to portray Plaintiff as a liar, who could not be believed, who, along with other women, made false claims against him.

38.     Defendant O'Reilly's defamatory campaign against Plaintiff continued on

September 19, 2017 when he appeared on the Today show, a daytime TV show, and was

interviewed by Matt Lauer.   During that interview, in which he was asked about The New

York Times article and the women who had made complaints of harassment and misconduct

against him, O'Reilly defamed Plaintiff repeatedly, including when he said:

> MR. O'REILLY: I've been in this business, I've worked for 12 companies; **not one time did I have any interaction with HR or any complaints filed against me.**

> * * *

9

MR. O'REILLY: ...every allegation is conviction...Every allegation in this area is a conviction. **They don't look for the truth**.

\* \* \*

MR. LAUER: But you were also named. [in the women's lawsuits].

MR. O'REILLY: I was named in a few of them.  A few of them.

MR. LAUER:  \* \* \* - - have you done some self-reflection and have you looked at the way you treated women that you think now or think about differently now than you did at the time?

MR. O'REILLY: My conscience is clear. **What I have done is organized a legal team to get the truth to the American people**.

\* \* \*

MR. O'REILLY: You know, nobody's a perfect person, but I can go to sleep at night very well knowing that **I never mistreated anyone on my watch in 42 years**.

39.     The above-referenced statements made by O'Reilly on <u>The Today Show </u>were false.

40.     By repeating that he did not have "any complaints filed against me" and that "he never mistreated anyone on my watch in 42 years" and that "his legal team [would] get the truth to the American people," O'Reilly's statements portrayed plaintiff as a liar who had brought unfounded complaints against him.

41.     In October of 2017, O'Reilly stated that the claims against him were "politically and financially motivated."  He also stated that he had "resolved matters privately because he wanted to protect his children from the publicity."  These false statements portrayed plaintiff in a false light and disparaged her character, in fact calling her a liar, political operative and extortionist.

10

42.     In October 2017, Mr. O'Reilly made several public appearances to promote a new book.  During those public appearances, he stated that the complaints made against him at Fox News by women who received settlements (an obvious reference to the small group identified in the April 1, 2017 New York Times article) were **"a political and financial hit job."**  This defamatory and disparaging statement is false.  Plaintiff Bernstein settled her claims and left Fox News because of severe mistreatment, harassment and abuse by Mr. O'Reilly, as he knows.

43.     On or about October 18, 2017, defendant O'Reilly held a press conference at the office of his lawyers with two lawyers in attendance.  The press conference was attended by Emily Steel and Michael Schmidt of The New York Times, which in print and online reaches millions of readers around the world.

44.     On October 21, 2017, The New York Times reported that defendant O'Reilly was recorded on October 18, 2017 making the following false, disparaging and defamatory statement in a taped on-the-record interview with The New York Times: **"I've been in the business for 43 years and I've never had a complaint filed by anyone at 12 different companies."**

45.     On October 23, 2017, The New York Times posted a podcast including an audio recording of defendant O'Reilly's on-the-record statements at that press conference he held at his lawyer's office on October 18, 2017.   In that press conference, New York Times reporter Michael Schmidt asked if O'Reilly wanted to address anything in the 2017 article. O'Reilly claimed that the settlement figures were wrong, and falsely stated:

Well, it's been a horrendous experience.  I've been in the broadcast business, journalism business 43 years.  I've never had one complaint filed against me by a coworker, in any Human Resources department in 43 years.  And that encompasses 12 different companies.

So, all of a sudden, all this stuff happens, and the pain it brings to my children is indescribable.  Indescribable.  And I would give up my life to protect my children, but I find myself not able to protect them because of things that are being said about me, their father.

\* \* \*

...Eric Bolling's son is dead. He's dead.  Because of allegations made, in my
opinion, and I know this to be true, against Mr. Bolling. No game.

46.     Defendant O'Reilly's above-comments were false, defamatory and meant to portray himself as a victim.  New York Times reporter Emily Steel noted that during the interview defendant O'Reilly claimed there was a "**left wing conspiracy that was behind his ouster and that he had been organizing a legal team to get the truth out to the American people**." Defendant O'Reilly then stated:

... **we have physical proof that this is bullshit.  Bullshit**.  Okay?  So, it's on you, if you want to destroy my children further.  All right? Because **it's all crap**.

\* \* \*

So why don't you be human beings for once.  This is horrible.  It's horrible what I went through, horrible what my family went through. **This is crap, and you know it.  It's politically and financially motivated, and we can prove it, with shocking information.**

47.     On October 23, 2017, Defendant O'Reilly appeared on Glenn Beck's radio program, full audio recording available at, https://soundcloud.com/glennbeck/10-23-17-bill-

oreilly-bonus, and O'Reilly again defamed plaintiff Bernstein with the following false

comments:

> Yeah, well, I was in the, uh, I have been in the broadcast business for
> 43 years, 12 different companies.  Never one time was there any
> complaint filed against me with Human Resources or anybody's legal
> team, nothing zero.

> 20 years and six months.  All right, 20 years and six months. [at Fox] I
> resolved three things.  That's all I resolved in 20 years and 6 months, **I
> resolved three things and the only reason I did resolve them was to
> keep my children safe**.

> \*\*\*

> My biggest mistake was settling.  You gotta understand how much
> pain this has caused me and my children. I would do anything for my
> children. That's why I did it.

48.     O'Reilly then falsely claimed that plaintiff Bernstein violated the

confidentiality provisions of her settlement agreement, by stating, "in my case, all the

confidentiality stuff was – violated – every bit of it."

49.     Defendant O'Reilly again defamed plaintiff and falsely accused her of

breaching her agreement when he said:  **"We thought people would uphold their oath and**

**what they agreed to do. They haven't."**

50.     On October 23, 2017, defendant O'Reilly stated on his podcast (hypocritically

called "No Spin News") and/or  posted on his website the following false, disparaging and

defamatory statements referring specifically to the settlements reached at Fox: "Smears in

this country now . . . allegations are facts.  No doubt about that.  Papers don't check anything

out, they just print whatever allegations they want to print.  And it's devastating, and that

brings me to the main point of this story.  The New York Times knows that I cannot

13

specifically refute anything. In 20 years, 6 months at the Fox News Channel, I resolved three

situations. Three I resolved. And I did that to protect my children from harm. And I would

do anything, anything to protect my children from harm. So it was three in 20 years and 6

months that I resolved. Part of the resolution is nobody talks about it. Now, obviously that's

been broken on the other side. But I can't break it. Because if I do, that opens everything all

up again and it's insane."

51.    Defendant O'Reilly also said on that podcast that <u>The New York Times</u> "came

back with a bunch of garbage" after having "attacked" him "in a very distorted way for these

harassment deals" in April.

52.    In another audio interview between Defendant O'Reilly and Glenn Beck (on

Glenn Beck's radio show, The Blaze: "Bill O'Reilly & Glenn Beck on the Opioid Crisis,

Uranium One, and More News from the Week"), which was posted on October 27, 2017 on

Defendant O'Reilly's website, billoreilly.com, with the audio available at,

https://www.billoreilly.com/f/Audio-Center#play, Defendant O'Reilly again states:

> <u>O'Reilly</u>: There are two things here. When it comes to women
> being, um. mistreated, that's the best word. Every American
> should want one thing - justice. Would you agree with that?
>
> <u>Beck</u>: Yes.
>
> <u>O'Reilly</u>: The other thing is verifiable is I've been in the business
> 43 years. **Never once was there a complaint filed against me
> with any HR in 12 different companies. Verifiable**.

53.    On October 23, 2017, defendant O'Reilly stated on his podcast and/or posted

on his website the following false, disparaging and defamatory statement: "The bottom line is

that my enemies who want to silence me have made my life extremely difficult and have hurt

14

me in the marketplace.  Anybody who doesn't like me will believe all the stuff the smear

merchants put out, but I'm interested in you, I'm interested in people who are fair-minded."

54.     On October 23, 2017, defendant O'Reilly continued to spin false stories on his

podcast and/or his website, falsely portraying himself as a victim, a truth teller, and an heroic

father (while he is none of those things), by stating: "You know, am I mad at God?  Yeah,

I'm mad at him. I wish I had more protection."  He went on to give advice which he has

obviously and repeatedly ignored: "**Never give up telling the truth.**  Never give up

protecting your family...... **I'm going to go down fighting and I'm going to go down telling

the truth**."

55.     On November 29, 2017, Defendants' defamation campaign against plaintiff

Bernstein continued, on O'Reilly's "No Spin News," available on BillOReilly.com, when

O'Reilly compared his own situation - and those of other well-known male broadcasters who

were taken off the air after harassment complaints were revealed - to being victims of "false

accusations" akin to the Salem Witch trials and indicating that he intended to sue his accusers

(which of course includes plaintiff) in court:

> All right, so there's a lot of talk about here in America and I'm going
> to be very precise in my analysis tonight because it's a fact that we
> have now entered a very dangerous period in our republic.  Today,
> Matt Lauer left NBC News because he was accused of something. * *
> *
>
> So I was thinking maybe we move the media from New York City to
> Salem, Massachusetts.
>
> * * *
>
> I've been upfront on this from the very beginning.  In my situation, I
> took the slings and arrows and I told my attorneys we'll abide by what

15

we promised to do. **But we are now going to confront everybody in court. That's where we're going to adjudicate, in my situation. We've already filed one lawsuit and we've got others ready to go.**

No more. No more. ... I went on The Today Show knowing that Matt Lauer is going to ask me questions because that's what his NBC bosses wanted him to do. Did I mind those questions? I didn't mind them. **I got my say loud and clear. You watch that interview, I got my point across.** That's the only thing that I ask when I go on media.

\* \* \*

Again, justice. No American should be abused in any way, shape, or form. If they are, they should go into the court where they can get a hearing. All right. No problem with that. **But accusations are not facts. Accusers are not automatically victims.** OK. The Duke lacrosse team. Do I have to say any more? I knew some of those families, destroyed because of false accusations that many in the media ran with all day long even though they had no blankin' idea what happened. (emphasis added)

56.    The above false statements by O'Reilly published on November 29, 2017, defamed plaintiff Bernstein as a member of a small identifiable group and accused her of making false reports of sexual harassment and lying about O'Reilly.

57.    Defendant's statements quoted in Paragraphs 32 through 55 were published broadly in whole or in part by numerous media outlets including, but not limited to, Newsweek, the Washington Post, NBCnews.com, New York Magazine, Money Magazine, CNN.com, CNBC.com, Vanity Fair, the LA Times, the Washington Examiner, Huffington Post, and the Chicago Tribune. These statements were published to millions of people around the world.

58.    By making the repeated false statements that plaintiff (a member of a small identifiable group) never complained, defendant O'Reilly portrayed her as a **liar and**

16

**extortionist** who had concocted complaints and never gave the company the opportunity to investigate them in a timely way.

59.     In the statements above, defendant O'Reilly portrayed himself as a "target" and claimed that complaints against him are extortionate. This is false. In fact, he is a serial abuser and plaintiff's complaints about him were far from extortionate.

60.     In defaming plaintiff, defendant knew that she was forced to sign the non-disparagement and confidentiality clauses and would be afraid to answer defendant's false, disparaging and defamatory statements.

61.     O'Reilly portrayed the small group of abused women identified in the April 1, 2017 New York Times article, including Ms. Bernstein, in a false light, defamed and disparaged their character, calling into question their motives for objecting to O'Reilly's abuse and ultimately being forced out at Fox News with a Settlement Agreement.

62.     In fact, Mr. O'Reilly is lying and covering up the truth. He mistreated Ms. Bernstein. She was forced out of her job at Fox News and paid a settlement because of his mistreatment. She did go to HR and other company executives to complain about him several times. Fox News took no action to protect plaintiff from O'Reilly. There were many witnesses to her mistreatment, some of which was recorded. She was not politically or financially motivated to seek legal redress for O'Reilly's abuse.

63.     These statements were designed to disparage plaintiff Bernstein by falsely stating that she never complained about O'Reilly's abuse, by claiming that O'Reilly did nothing wrong, by claiming that plaintiff is "smearing" him in order "to silence" him, and by claiming that plaintiff breached a contract by violating her Settlement Agreement.

17

### E.    O'Reilly Accused Plaintiff of a Serious Crime

64.    As shown above, in direct response to reporting about plaintiff's settlement agreement with Fox News, defendant O'Reilly stated repeatedly that he is "**vulnerable to lawsuits from individuals who want me to pay them to avoid negative publicity**." O'Reilly stated repeatedly that plaintiff's complaints about him in 2002 were "financially motivated" and a "financial hit job."

65.    Thus, defendant O'Reilly charged plaintiff with a **serious crime**.  New York Consolidated Laws, Penal Law Section 155.05 2 (e) defines the crime of **larceny** as including when "[a] person obtains property by **extortion** when he compels or induces another person to deliver such property to himself or to a third person by means of instilling in him a fear that, if the property is not so delivered, the actor or another will: (v) [e]xpose a secret or publicize an asserted fact, whether true or false, tending to subject some person to hatred, contempt or ridicule....."

66.    When accusing plaintiff of the crime of larceny (through extortion), defendant knew his statements were false or he was recklessly disregarding their truth or falsity.

### F.    O'Reilly Impugned Plaintiff's Character

67.    Through the statements described, defendant O'Reilly impugned plaintiff's character as dishonest or immoral.  He made specific factual statements that are susceptible of a defamatory meaning.

68.    Defendant's statements have a precise meaning that is readily understood. Defendant's statements can be proven false.  The statements were made in such a context that listeners and readers would hear them as factual, not opinion.

69.     Defendant O'Reilly's statements that plaintiff was motivated by financial gain was not accompanied by any recitation of the "facts" upon which it was based, although he repeatedly and clearly stated that he knows certain facts which he or his lawyers would reveal, about organized efforts to attack defendant for political or financial reasons. Defendant's flat-out denial of a provable, specific allegation against him concerning his own conduct, accompanied by a claim that the accuser is lying, constitutes defamation under New York law, as recently ruled in Zervos v. Trump, 2019 WL 1187433 (March 14, 2019).

70.     Defendants' defamatory statements are not protected by any privilege and are defamatory per se.

71.     Defendant O'Reilly repeatedly made the knowingly false claim that plaintiff was a liar and that her claims of mistreatment  - which formed the basis of her severance agreement - were false and financially and/or politically motivated.

72.     Defendant O'Reilly repeatedly made the knowingly false claim that plaintiff lied about being harassed and mistreated by him.

73.     Plaintiff is not a public figure.

**G.     Plaintiff has been Subjected to Public Ridicule
as a Result of Defendant's Defamatory Statements**

74.     After The New York Times article was printed and defendant O'Reilly began to disparage and defame plaintiff, plaintiff was held up to public ridicule. For example, on December 4, 2017, a woman unknown to plaintiff, Debbie Himes Beamer, messaged plaintiff on Facebook stating: "Another lying whore. Pathetic. And yes the world is laughing their ass off at you."

75.     In December 2017, The Hill printed a story about plaintiff's lawsuit. The comments to the story reflect many of the comments after numerous stories around the world after the <u>New York Times</u> story and include the following:

a.      " Drag a hundred-dollar bill through a trailer park, you never know what you'll find."

b.      "It must be great to shake a company down for millions of dollars because someone desires you just because you have the right genitalia. It's terrible for freedom, rights and liberty, but great for phony, hypocritical opportunistic women."

c.      "How were these skanks defamed?"

76.     Defendant O'Reilly's website includes numerous ridiculing comments which caused plaintiff extreme emotional stress.

77.     Plaintiff went to a Passover Seder in April of 2017 and a man said to plaintiff, "are you the girl who was harassed?  You probably deserved it."

78.     After defendant began his defamation campaign, plaintiff experienced such severe emotional distress that she missed several days of work as a producer on a television show.  Plaintiff had trouble sleeping and experienced such severe anxiety that she needed anti-anxiety medication. Plaintiff also sought counseling as a result of the depression, anxiety and insomnia she experienced as a result of defendant's defamatory statements.

**H.      Although Defendant's Conduct Constitutes Defamation *Per Se*,**
**in the Alternative, Plaintiff has Suffered Special Financial Damages**

79.     Although defendant's statements are defamatory *per se*, in the event that the Court finds she is required to plead special damages, plaintiff has suffered financially in that

she has spent over $6,500 for medication and therapy as a result of defendant's defamation, which branded plaintiff as a liar who was financially and/or politically motivated to complain about defendant's harassment and abuse.

80.     In the television industry, which is famously insular, if plaintiff needs to seek employment, she will be significantly affected by O'Reilly's defamation and the fact that she had a Settlement Agreement with a prior employer and complained about the behavior of her prior boss.  Her employment prospects are similarly harmed because her reputation for truthfulness and honesty has been damaged by defendant.

81.     Plaintiff is also well aware that defendant O'Reilly's followers, to this day, hold plaintiff up to ridicule and believe his false statements that plaintiff brought complaints against him as part of an illegal extortion.

82.     As a direct and proximate result of the aforesaid defamation, plaintiff has suffered and will continue to suffer damages to her reputation, severe emotional distress, physical sickness, special damages and loss of income.

### COUNT TWO

### (BREACH OF CONTRACT)

83.     Plaintiff repeats and incorporates the allegations set forth above as if fully set forth herein.

84.     By disparaging plaintiff Bernstein, defendant O'Reilly breached the contract in which he was both a Third Party Beneficiary and Assignee.

21

85.     As a direct and proximate result of the aforesaid breaches of contract, plaintiff Bernstein has suffered and will continue to suffer damages to her reputation, severe emotional distress, physical sickness, and loss of income.

### **PRAYER FOR RELIEF**

WHEREFORE, plaintiff respectfully requests Judgment against defendant as follows:

a.     Ordering defendant to retract any and all defamatory statements and/or apologize for such statements;

b.     Ordering defendant to pay compensatory damages in an amount to be determined at trial;

c.     Ordering defendant to pay punitive damages in an amount to be determined at trial; and

d.     Awarding pre- and post-judgment interest, costs, and such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury in this action on all claims that are triable by a jury.

**SMITH MULLIN, P.C.**
Attorneys for Plaintiff Rachel Witlieb Bernstein

BY:   /s/ Neil Mullin

NEIL MULLIN
NANCY ERIKA SMITH
(admitted *pro hac vice*)
240 Claremont Avenue
Montclair, New Jersey 07042
(973) 783-7607; fax: (973) 783-9894
and
420 Lexington Avenue, Suite 300
New York, New York 10170
(212) 297-6134; fax: (917) 677-3697
(nmullin@smithmullin.com)
(nsmith@smithmullin.com)

Dated:  April 11, 2019