```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------X
RACHEL WITLIEB BERNSTEIN,

                    Plaintiff,              17 Civ. 9483 (DAB)
        v.                                  MEMORANDUM & ORDER


BILL O'REILLY, FOX NEWS NETWORK LLC,
TWENTY-FIRST CENTURY FOX, INC.

                    Defendants.
--------------------------------------X
```
DEBORAH A. BATTS, United States District Judge.

Plaintiff Rachel Witlieb Bernstein ("Plaintiff") brings this action against Defendant Bill O'Reilly ("O'Reilly"). Plaintiff alleges defamation and breach of contract against O'Reilly in her Third Amended Complaint ("TAC"). O'Reilly moves to dismiss the TAC for failure to state a claim under Fed. R. Civ. P. 12(b)(6).

For the reasons set forth below, O'Reilly's Motion to Dismiss is GRANTED in its entirety.

I. **Background**

The following facts are drawn from the TAC and are assumed true for purposes of the instant motion. The Court presumes familiarity with the procedural background as set forth in our Memorandum and Order dated March 5, 2019. (Mem. & Order, ECF No. 128.)

Plaintiff and O'Reilly are former employees of Fox.[1] (See Third Am. Compl. "TAC" ¶¶ 6-20, ECF No. 130.) O'Reilly hosted his own cable program on Fox. (Id. ¶ 7.)

In July 2002, Plaintiff entered into a Severance Agreement ("Agreement") with Fox which included the following Non-Disparagement Clause:

> 5(f) Non-Disparagement: Witlieb and Fox each agree not to disparage, trade libel, or otherwise defame each other, and in the case of Fox, Witlieb agrees not to disparage, trade libel, or otherwise defame its officers or employees, including without limitation, Bill O'Reilly. In the case of Witlieb, for purposes of this Paragraph 5( e ), the term "Fox" shall mean the released parties referenced in Paragraph 4(a) above, including Bill O'Reilly, and said released parties agree not to disparage, trade libel, or otherwise defame Witlieb.

(Id. ¶¶ 26, 27.) The General Release provides that Plaintiff releases Fox News, its employees, and Household Inc. which allegedly is a company under which O'Reilly did business. (Id. ¶ 26.)

On April 1, 2017, the New York Times published an article (the "Article") titled "Bill O'Reilly Thrives at Fox News, Even as Harassment Settlements Add Up." (Id. ¶ 29.) The Article alleged that O'Reilly and Fox had settled several harassment claims (the "settled claims") against O'Reilly and that the settlement funds

---

[1] Fox is a television news and entertainment company which was also named as a defendant in this action. This Court dismissed all claims against Fox in its Memorandum and Order dated March 5, 2019. (See ECF No. 128.)

were received by several former employees of Fox. (Id.) The Article named five women, including Plaintiff, as the recipients of these purported settlement funds. (Id. ¶ 31.) On April 19, 2017, O'Reilly parted ways with Fox. (Id. ¶ 33.)

Thereafter, the TAC alleges that O'Reilly made the following public statements about the settled claims:

1. Statement 1: On April 19, 2017, O'Reilly said on Fox News that he was "parting ways with Fox News" due to "completely unfounded claims" which are part of a "liberal smear campaign" and a "brutal campaign of character assassination that is unprecedented in post-McCarthyist America." (TAC ¶ 33.)

2. Statement 2: On September 13, 2017, O'Reilly commented in The Hollywood Reporter:

    . . . [M]ost importantly, I'm a father who cares deeply for my children and who would do anything to avoid hurting them in any way. And so I have put to rest any controversies to spare my children.

    The worst part of my job is being a target for those who would harm me and my employer, the Fox News Channel. Those of us in the arena are constantly at risk, as are our families and children. My primary efforts will continue to be to put forth an honest TV program and to protect those close to me.

    (Id. ¶ 34.)

3. Statement 3: In that same article, O'Reilly said that "no one was mistreated on [his] watch" and "once you get a famous name, and once you're in the political arena, the combination is devastating[;] [i]f they can get you, they're going to get you." (Id. ¶¶ 35-36.)

4. Statement 4: On September 18, 2017, O'Reilly stated on Sean Hannity's radio show that he was a "victim" of false accusations and that after his "investigation" he would give the public "facts," "no he said she said. Facts. Cold stone facts. Shocking the defamation that can occur." He said, "They don't care if it's true or not[;] [a]llegations

3

    become facts," referring to the harassment claims exposed in the Article. (Id. ¶ 37.)

5. Statement 5: On September 19, 2017, O'Reilly said on the Today Show, "not one time did I have any interaction with HR or any complaints filed against me." (Id. ¶ 38.)

6. Statement 6: On that same show, O'Reilly said, "Every allegation in this area is a conviction[;] [t]hey don't look for the truth[,]" and that he has "organized a legal team to get the truth to the American people," about the harassment claims against him. (Id.)

7. Statement 7: On that same show, O'Reilly said, "I never mistreated anyone on my watch" (Id.)

8. Statement 8: In October of 2017, O'Reilly stated that claims against him were "politically and financially motivated" and that he had "resolved matters privately because he wanted to protect his children from the publicity." (Id. ¶ 38.)

9. Statement 9: In several public appearances to promote a new book during October 2017, O'Reilly said he stated that the complaints made against him at Fox News by women who received settlements were "a political and financial hit job." (Id. ¶ 42.)

10. Statement 10: In a press conference held on October 18, 2017 and reported by the New York Times on October 21, 2017, O'Reilly said "I've been in the business for 43 years and I've never had a complaint filed by anyone at 12 different companies." (Id. ¶¶ 42-45.)

11. Statement 11: In that same press conference reported by the New York Times, O'Reilly claimed there was a "left wing conspiracy that was behind his ouster and that he had been organizing a legal team to get the truth out to the American people." (Id. ¶ 46.)

12. Statement 12: In that same press conference reported in the New York Times, O'Reilly said "we have physical proof that this is bullshit," referring to the settled claims and that they were all "crap." (Id.)

13. Statement 13: In that same press conference reported in the New York Times, O'Reilly said, "This is crap, and you know

>   it[;] [i]t's politically and financially motivated, and we can prove it, with shocking information." (Id.)

14. Statement 14: On October 23, 2018, O'Reilly stated on Glenn Beck's radio show that there were no complaints filed against him or anybody's legal team in 43 years and that he "resolved three things and the only reason [he] did, resolve them was to keep [his] children safe." (Id. ¶ 47.)

15. Statement 15: On that same show, O'Reilly stated that the "confidentiality stuff was - violated - every bit of it[,]" referring to the settlement agreements and that "[w]e thought people would uphold their oath and what they agreed to do[;] [t]hey haven't." (Id. ¶ 48.)

16. Statement 16: On October 23, 2017, O'Reilly stated on his own podcast:

   > Smears in this country now ... allegations are facts. No doubt about that. Papers don't check anything out, they just print whatever allegations they want to print. And it's devastating, and that brings me to the main point of this story. The New York Times knows that I cannot specifically refute anything. In 20 years, 6 months at the Fox News Channel, I resolved three situations. Three I resolved. And I did that to protect my children from harm. And I would do anything, anything to protect my children from harm. So it was three in 20 years and 6 months that I resolved. Part of the resolution is nobody talks about it. Now, obviously that's been broken on the other side. But I can't break it. Because if I do, that opens everything all up again and it's insane.

   (Id. ¶ 50.)

17. Statement 17: In that same podcast, O'Reilly stated that the New York Times "came back with a bunch of garbage" after having "attacked" him "in a very distorted way for these harassment deals" in April. (Id. ¶ 51.)

18. Statement 18: In another audio interview with Glenn Beck which was posted on October 27, 2017, O'Reilly said, "Never once was there a complaint filed against me with any HR in 12 different companies[;] [v]erifiable." (Id. ¶ 52.)

19. Statement 19: On October 23, 2017, O'Reilly said on his podcast, "The bottom line is that my enemies who want to silence me have made my life extremely difficult and have hurt me in the marketplace[;] [a]nybody who doesn't like me will believe all the stuff the smear merchants put out,

> but I'm interested in you, I'm interested in people who are fair-minded." (<u>Id.</u> ¶ 53.)

20. <u>Statement 20</u>: On October 23, 2017 O'Reilly said on his podcast that he would "never give up telling the truth" and that he will "go down fighting" and "go down telling the truth." (<u>Id.</u> ¶ 54.)

21. <u>Statement 21</u>: On November 29, 2017, O'Reilly said in a show on his website that he will sue his accusers and that "accusations are not facts[;] [a]ccusers are not automatically victims." (<u>Id.</u> ¶ 55.)

On April 11, 2019, Plaintiff filed the operative TAC bringing two counts of defamation and breach of contract against O'Reilly. In Count 1, Plaintiff alleges that O'Reilly's public statements defamed her by portraying her as a financially and politically motivated liar. She alleges that she is not a public figure. (<u>Id.</u> ¶ 73.) She alleges that his statements are "defamatory per se" because O'Reilly accused Plaintiff of larceny and extortion which are "serious crimes". (<u>Id.</u> ¶¶ 64-66.)

Plaintiff also alleges that she suffered special damages because of O'Reilly's defamation. (<u>Id.</u> ¶ 79.) She alleges that she was publicly humiliated and ridiculed, online and at least once in person. Thereafter, she alleges that she suffered such severe emotional distress that she missed several days of work; she had trouble sleeping; she experienced such severe anxiety that she needed anti-anxiety medication; and she sought counseling as a result of the depression, anxiety, and insomnia. (<u>Id.</u> ¶ 78.) She alleges that she has spent "at least $6,500" for medication and

therapy and that her future employment prospects have been diminished in the insular television industry. (Id. ¶¶ 80, 82.)

In Count 2, Plaintiff alleges that O'Reilly's public statements breached the Confidentiality[2] and Non-Disparagement clauses of the Agreement. She alleges that he was a third-party beneficiary and assignee to the Agreement. (Id. ¶ 85.) She also alleges that she "has suffered and will continue to suffer damages to her reputation, severe emotional distress, physical sickness, and loss of income" as a result of the alleged breaches of contract. (Id. ¶ 86.)

## II. Legal Standard on a Motion Under Rule 12(b)(6)

For a Complaint to survive a motion brought pursuant to Fed. R. Civ. P. 12(b)(6), the plaintiff must have pleaded "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility," the Supreme Court has explained,

> when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops

---

[2] The Confidentiality Clause is not included in the TAC.

7

> short of the line between possibility and plausibility of entitlement to relief."

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 556–57). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (citation and alteration omitted). "In keeping with these principles," the Supreme Court has stated,

> [A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

Iqbal, 556 U.S. at 679.

In considering a motion under Rule 12(b)(6), a court must accept as true all factual allegations set forth in a complaint and draw all reasonable inferences in favor of the plaintiff. See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 n.1 (2002); Blue Tree Hotels Inv. (Canada) Ltd. v. Starwood Hotels & Resorts Worldwide, Inc., 369 F.3d 212, 217 (2d Cir. 2004). However, this principle is "inapplicable to legal conclusions," Iqbal, 556 U.S. at 678, which, like a complaint's "labels and conclusions,"

Twombly, 550 U.S. at 555, are disregarded. Nor should a court "accept [as] true a legal conclusion couched as a factual allegation." Iqbal, 556 U.S. at 678. In resolving a 12(b)(6) motion, a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in, or integral to, the complaint. DiFolco v. MSNBC Cable LLC, 622 F.3d 104, 111 (2d Cir. 2010).

III. Discussion

    A. Plaintiff's Defamation Claim – Count I

        1. Applicable Law

Under New York law,[3] a false statement tending "to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or [to] induce an evil opinion of him" constitutes defamation. Elias v. Rolling Stone LLC, 872 F.3d 97, 104 (2d Cir. 2017). "To state a claim for defamation under New York law, a plaintiff must allege (1) a false statement of fact, (2) about plaintiff, (3) published to a third party without authorization or privilege, (4) through fault amounting to at least negligence, and (5) causing defamation per se or a special harm." Krzesaj v. Henry, No. 16 Civ. 2926,

---

[3] It is undisputed that New York law applies to Plaintiff's Claims.

9

2017 U.S. Dist. LEXIS 37543, *39 (S.D.N.Y. March 15, 2017) (internal quotation marks and citations omitted).

To plead special harm, a plaintiff must "fully and accurately" state "the loss of something having economic or pecuniary value which must flow directly from the injury to reputation caused by the defamation." Krzesaj, 2017 U.S. Dist. LEXIS 37543, at *39-40 (quoting Celle v. Filipino Reporter Enters., 209 F.3d 163, 179 (2d Cir. 2010)); Matherson v. Marchello, 100 A.D.2d 233, 473 (2d Dept. 1984). Emotional distress from a plaintiff's knowledge that he or she was defamed is not special harm, even if it resulted in out-of-pocket medical costs. See Korry v. International Tel. & Tel. Corp., 444 F. Supp. 193, 197 (S.D.N.Y. 1978) (allegations that defamation caused plaintiff emotional distress among other injuries to an undifferentiated total of $2 million do not constitute special harm); Andrews v. Hansford Mfg. Corp., Index# 4641/00, 2002 N.Y. Misc. LEXIS 102, *6 (N.Y. Sup. Ct. January 22, 2002) (holding that the claimed damages for emotional distress, "do not constitute the loss of something having economic or pecuniary value flowing directly from the injury to the Plaintiff's reputation"); See generally, Restatement (Second) of Torts § 575 cmt. (c) ("[E]motional distress caused to the plaintiff by his knowledge that he has been defamed is not special harm."). Moreover, special damages must be itemized; "round figures or a general allegation of a dollar amount as special damages will not

10

suffice." Nunez v. A-T Fin. Info., 957 F. Supp. 438, 441 (S.D.N.Y. 1997) (citing Boyle v. Stiefel Labs., Inc., 204 A.D.2d 872, 612 N.Y.S.2d 469, 471 (3d Dep't), appeal denied, 84 N.Y.2d 803 (1994)).

To plead defamation per se, Plaintiff must allege that the defamatory statements: "(i) charg[e] plaintiff with a serious crime; (ii) that tend to injure [plaintiff] in his or her trade, business or profession; (iii) [charge] plaintiff [with] a loathsome disease; or (iv) imput[e] unchastity to a woman." Liberman v. Gelstein, 80 N.Y.2d 429, 435(1992). Liberman, 80 N.Y.2d at 435. In defamation per se, the law presumes that damages will result. Id.

### 2. Plaintiff's Defamation Claim is DISMISSED.

Once again, Plaintiff's allegations of special damages and defamation per se are insufficient to sustain her defamation claim.[4] Plaintiff alleges that she suffered special damages of "at least $6,500" from seeking medical treatment for the emotional distress she suffered as a result of her alleged public humiliation and ridicule by O'Reilly. First, Plaintiff's emotional distress is not special harm because it directly stems from her knowledge that she has been defamed, even though it resulted in out-of-pocket medical costs. Second, Plaintiff does not give a specific, itemized amount for her special damages, instead generally alleging that

---

[4] Having found Plaintiff's allegations of special damages and defamation per se are insufficient to sustain her defamation claim against O'Reilly, we do not address whether O'Reilly's statements constitute defamation under New York law.

11

she paid "at least $6,500." This round figure is insufficient to sustain Plaintiff's allegation of special harm. Finally, Plaintiff argues that her future employment prospects have been diminished in the insular television industry. However, it is black letter law that diminished future employment prospects do not constitute special damages. <u>Vasarhelyi v. New Sch. for Soc. Research</u>, 646 N.Y.S.2d 795, 796 (1996) (citing <u>Aronson v. Wiersma</u>, 65 N.Y.2d 592, 595 (1985) and <u>Talbot v. Johnson Newspaper Corp.</u>, 124 A.D.2d 284, 286-87 (N.Y. App. Div. 1986)). For these reasons, her allegation of special damages is insufficient to sustain her defamation claim against O'Reilly.

Moreover, O'Reilly's statements are not defamatory <u>per</u> <u>se</u> because they do not accuse Plaintiff of committing the crime of extortion. O'Reilly's statements call Plaintiff an extortionate, "politically-motivated" liar, complain that the settled claims were "financially motivated" and financial "hit job[s]," and state that he is "vulnerable to lawsuits from individuals who want me to pay them to avoid negative publicity," (TAC ¶ 32). These statements, however, do not convey with specificity that Plaintiff committed the crime of extortion. Under New York law, using colloquial phrases and loose statements such as "shakedown," "crawling up your back," "fraudulent" or calling a party "extortionate," "no good," or "a criminal" does not constitute defamation <u>per</u> <u>se</u> because these phrases do not convey with

12

reasonable specificity that the party committed a crime.[5] Similarly, O'Reilly's statements here - including "hit job" and "politically and financially motivated" liar - are equivalently loose and hyperbolic in nature. Thus, they do not constitute actionable defamation per se because they do not reasonably convey that Plaintiff committed the crime of extortion.

Plaintiff has again failed to allege sufficiently either special damages or defamation per se. Therefore, her defamation claim against O'Reilly is DISMISSED with prejudice.

B. Plaintiff's Breach of Contract Claim – Count II

"Under New York state law, the elements of a breach of contract claim are: (1) the existence of a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." MBIA Ins. Corp. v. Royal Bank of Can., 706 F. Supp. 2d 380, 396 (S.D.N.Y. 2009) (citing Terwilliger v.

---

[5] See 600 West 115th Street Corp. v. Von Gutfeld, 80 N.Y.2d 130, 143 (N.Y. 1992) (colloquial and loose terms such as "smells of" and "fraudulent as you can get" do not invite reasonable persons to find specific factual allegations and therefore do not seriously accuse plaintiff of a crime); Pecile v. Titan Capital Grp., LLC, 947 N.Y.S.2d 66, 67 (1st Dept. 2012) (loose, hyperbolic language such as "shakedown" does not convey with specificity that defendants were seriously accusing plaintiffs of committing the crime of extortion); see also McNamee v. Clemens, 762 F. Supp. 2d 584, 604 (E.D.N.Y. 2011) (finding that phrases like "shake down" or "crawling up your back" are hyperbolic, "loose" statements that do not seriously accuse plaintiff of the crime of extortion) (citing as examples, Galasso v. Saltzman, 42 A.D.3d 310, 311 (1st Dept. 2007) (calling a party "no good" and "a criminal," asserting that he was "engaged in criminal conduct," and had "committed crimes" against the property in an effort to "destroy both our properties and our beach" was not actionable); Trustco Bank of New York v. Capital Newspaper Div. of Hearst Corp., 213 A.D.2d 940, 942 (3rd Dept. 1995) (finding that no reasonable reader could understand that the statement, "[e]xtortion-that's what Trustco is looking for" means that plaintiff committed the criminal act of extortion); and 600 West 115th Street Corp. v. Von Gutfeld, 80 N.Y.2d 130, 143 (N.Y. 1992)).

Terwilliger, 206 F.3d 240, 245-46 (2d Cir. 2000)). "[P]laintiffs asserting breach of contract claims must allege facts showing damage caused by the alleged breach." Northern Shipping Funds I, L.L.C. v. Icon Capital Corp., No. 12 Civ. 3584, 2013 U.S. Dist. LEXIS 55802, *25 (S.D.N.Y. April 12, 2013) (quoting US Airways Group v. British Airways Plc, 989 F. Supp. 482, 492 (S.D.N.Y. 1997)). "Moreover, a party seeking damages for breach of contract . . . must demonstrate that the damages were caused by and are directly traceable to the . . . breach." Id. (internal quotation marks and citation omitted).

We dismissed Plaintiff's breach of contract claim in our previous Memorandum and Order stating:

> Plaintiff has not alleged facts showing damage caused by O'Reilly's alleged breach of contract. Plaintiff repeats that she suffered damages to her reputation, severe emotional distress, physical sickness, and loss of income as a "direct and proximate result" of O'Reilly's alleged breach of contract. However, once again, she fails to explain how her losses were caused by and are directly traceable to the alleged breach of contract. She also fails to allege any facts, beyond her bald allegations of damages, establishing what, if any, emotional and physical harms and reputational damage she specifically suffered.

(Mem. & Order at 6.)

Plaintiff does not even attempt to remedy this deficiency in the TAC; instead, she repeats the same allegations of damages that

we found insufficient in the Second Amended Complaint.[6] Therefore, her breach of contract claim is DISMISSED with prejudice.

   C. <u>Leave to Replead</u>

When a Complaint has been dismissed, permission to amend it "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). However, a court may dismiss without leave to amend when amendment would be "futile," or would not survive a motion to dismiss. <u>Hutchison v. Deutsche Bank Sec., Inc.</u>, 647 F.3d 479, 490-91 (2d Cir. 2011).

Plaintiff has had two opportunities to plead her defamation claim. Both times she has failed to meet her burden of plausibly alleging special damages or defamation <u>per se</u>. Moreover, Plaintiff did not even attempt to remedy the deficiencies that this Court identified in Plaintiff's breach of contract claim. Having already given Plaintiff numerous chances to remedy the deficiencies in her pleadings, we conclude that it would be futile to allow her to replead the same Counts again. Accordingly, we deny Plaintiff leave

---

[6] Plaintiff's breach of contract claim was also previously dismissed on the basis that Plaintiff did not allege that O'Reilly, a non-signatory to the Agreement, assumed or was assigned the contract. (Mem. & Order 17.)  Plaintiff baldly alleges in the TAC that O'Reilly was an assignee simply because he was identified as a Releasee under the Agreement. She does not even attempt to explain whether he "participated in the negotiations and drafting of the contract," acknowledged that he is the actual party in interest, "micro-manag[ed] performance under the contract," or "[made] payments on behalf of the signatory." <u>See</u> <u>MBIA Ins. Corp. v. Royal Bank of Can.</u>, 706 F. Supp. 2d 380, 398 (S.D.N.Y. 2009) (discussing various factors New York courts considered in determining whether a non-signatory can be held liable for breach of contract). Thus her conclusory legal conclusion, without more, is insufficient to show that he was assigned the Agreement.

to replead either of the Counts alleged in her TAC and DISMISS the TAC with prejudice.

IV. Conclusion

For the reasons set forth above O'Reilly's Motion to Dismiss is GRANTED in its entirety. The TAC is DISMISSED IN ITS ENTIRETY WITH PREJUDICE.

The Clerk of Court is directed to close the docket # 132 in this case and to terminate this matter.

SO ORDERED.

Dated: New York, New York
       September 26, 2019

_____
Deborah A. Batts
United States District Judge